[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Procedural History
This lawsuit first came to this court by application for temporary and permanent injunction and order to show cause which was accompanied by a complaint all dated June 9, 1995 and filed on June 13, 1995.
The complaint, in the first count, sought a declaratory CT Page 5888 judgment; in the second count, specific performance; in the third count, an order enjoining the defendants from certain actions; in the fourth count, an accounting; in the fifth count, a claim of interfering with business expectancies; in the sixth count, breach of a settlement contract; and, in the seventh count, a claim of unfair and deceptive and proscribed by C.G.S. § 142-110a, et seq.
A temporary ex parte injunction was granted by the court,Teller, J. on June 13, 1995.
On June 26, 1995, the defendant The Cadle Company appeared by counsel.
On July 24, 1995, a default for failure, to appear was granted against the defendant ALI, Inc.
On July 28, 1995, the defendant ALI, Inc. appeared by counsel.
On August 3, 1995, a motion for default for failure to plead was granted against the defendant ALI, Inc.
On August 18, 1995, a motion for default for failure to plead was entered against the defendant The Cadle Company.
On August 23, 1995, the defendant The Cadle Company filed an answer and counterclaim. The answer of The Cadle Company responded to all seven counts of the complaint and then went on to assert a two-count counterclaim.
On August 25, 1995, the defendant ALI, Inc. filed an answer to the seven-count complaint.
On September 11, 1995, the plaintiff (counterclaim defendant) filed an answer and special defenses to the counterclaim of The Cadle Company.
On October 2, 1995, The Cadle Company filed a reply to the plaintiff's (counterclaim defendants) special defenses, closing the pleadings.
Findings of Fact
At the commencement of trial on May 7, 1996, all counsel CT Page 5889 of record for the plaintiff, the defendant ALI, Inc. and The Cadle Company filed a document entitled "Stipulations for Trail" (Plaintiff's Exhibit 1), which is set forth herein in its entirety.
STIPULATIONS FOR TRIAL
 Plaintiff Darwin C. Gebbie (hereinafter "Mr. Gebbie") joins defendants The Cadle company (hereinafter "Cadle") and ALI, Inc. (hereinafter "ALI") in submitting the following as stipulations of fact for use in the trial of the case.
 1. Mr. Gebbie is the owner of real property, generally described here as +/- 9.27 acres of vacant land off of Stockhouse Road in Bozrah, Connecticut.
 2. On December 30, 1992, for consideration received, Mr. Gebbie, granted a mortgage on said property to New England Savings Bank. The mortgage and associated promissory note were in the original amount of $320,000. Said mortgage is recorded at Volume 51, Page 884 of the Bozrah Land Records.
 3. Mr. Gebbie is also the owner of real property, generally described here as a multi-family dwelling at 195 Fitchville Road in Bozrah, Connecticut.
 4. On December 15, 1988, for consideration received, Mr. Gebbie, granted a mortgage on said property to New England Savings Bank. The mortgage and associated promissory note were in the original amount of $280,000. Said mortgage is recorded at Volume 44, Page 768 of the Bozrah Land Records.
 5. New England Savings Bank was declared insolvent on May 21, 1993, and the Federal Deposit Insurance Corporation ("FDIC") was appointed its Receiver.
 6. The FDIC sold the mortgage aforesaid to defendant ALI, Inc., with an address c/o Fleet Management Recovery Corporation, 245 Summer Street, Boston, Massachusetts.
 7. In July 1994, ALI, Inc. brought a foreclosure action in the Superior Court, Judicial District of New London at New London, entitled ALI, Inc. v. Darwin C. Gebbie, Docket No. CV94-0531427, alleging a default in the mortgage on the Stockhouse Road Property. ALI, Inc. was represented in suchCT Page 5890 matter by Paul M. Geraghty of Andrews, Quinn, Cosgrove Young, P.C. and Gebbie was represented by Mark E. Block of O'Brien, Shafner, Stuart, Kelly Morris, P.C.
 8. In July 1994, ALI, Inc. brought a foreclosure action in the Superior Court, Judicial District of New London at New London, entitled Ali, Inc. v. Darwin C. Gebbie, Docket No. CV94-0531540, alleging a default in the mortgage on the Fitchville Road property. ALI, Inc. was represented in such matter by Paul M. Geraghty of Andrews, Quinn, Cosgrove Young, P.C. and Gebbie was represented by Mark E. Block of O'Brien, Shafner, Stuart, Kelly Morris, P.C.
 9. The counsel aforesaid negotiated on behalf of their respective clients and, on March 14, 1995, Paul Geraghty sent Mark Block a letter identifying the terms by which both debts could be modified. Plaintiff seeks to enforce these terms and defendant ALI concurs that there is such agreement, while defendant Cadle denies that there is an agreement and counterclaims to enforce the terms of original promissory notes.
 10. The first payment called for in the agreement between Gebbie and ALI, Inc. was a non-refundable $4,000 deposit. Said payment was made between counsel in March, 1995, and was received and accepted by ALI, Inc. agents.
 11. In March-April, 1995, ALI, Inc. offered the debt instruments for sale at public auction through its agents Fleet Associates and Fleet Management Recovery Corporation. On April 26, 1995, Cadle successfully bid on the two loans.
 12. On April 28, 1995, ALI and Cadle entered into a written Loan Sale Agreement, and on May 5, 1995 a Bill of Sale was executed between them; accordingly, Cadle became the successor owner of the two loans of Mr. Gebbie.
 13. No further action was taken in the foreclosure actions and case CV94-0531427 was withdrawn by ALI on or about October 16, 1995 and case CV94-0531540 was dismissed for dormancy by the court on June 16, 1995.
Attorneys Block and Geraghty negotiated an agreement on behalf of their respective clients which was memorialized in a letter dated March 14, 1995 ("Letter Agreement"). Said CT Page 5891 Letter Agreement stated the terms under which the stockhouse and Fitchville Mortgages would be modified.
The plaintiff and ALI agree that an agreement to modify the Stockhouse and Fitchville Mortgages exist as represented by the March 14, 1995 letter. (Exhibit P-2.)
Attorney Geraghty was acting pursuant to instructions from and the authority of Mr. Brent Carrier for ALI when he drafted and mailed the Letter Agreement to Attorney Block.
Brent Carrier worked for Fleet Management Recovery Corp., the agent hired by ALI to service and collect on the loans.
The Letter Agreement from Attorney Geraghty to Attorney Block states the terms of the agreement between ALI and Mr. Gebbie, and said terms had been approved by ALI.
The Letter Agreement called for the payment of a nonrefundable deposit in the amount of $4,000. Said payment was sent by Attorney Block to Attorney Geraghty. The payment was received and accepted, was sent by Mr. Geraghty to Mr. Carrier, and the check was placed uncashed in the files of Fleet Management Recovery Corp.
Although the Letter Agreement required the $4,000.00 deposit be paid within two days, the payment was not sent until March 28, 1995. Attorney Geraghty, in sending the deposit check to Mr. Carrier, advised that the settlement was on track. Mr. Carrier did not declare Mr. Gebbie in default of the Settlement Agreement when the check was not received within two days.
In March-April 1995, ALI offered the Fitchville and Stockhouse mortgages for sale at public auction through its agents Fleet Associates and Fleet Management Recovery Corporation.
Although the letter of March 14, 1995 stated that the offer must be closed within 30 days, that term was added by Attorney Geraghty; it was not a term required by Brent Carrier, and Mr. Carrier did not intend to bind Mr. Gebbie to the 30 day limit. ALI only needed to close by June 30, 1995. CT Page 5892
The 30 days referenced in the Letter Agreement by ALI was waived when Mr. Carrier twice instructed Attorney Geraghty to cease working to document the deal, to allow the loan purchaser to use its own forms for the promissory note and mortgage modification agreement, as was common practice, and intending that ALI not incur legal costs for which it would not be reimbursed.
No further action was taken in the foreclosure actions and case CV94-0531427 was withdrawn by ALI on or about October 16, 1995 and case CV94-0531540 was dismissed for dormancy by the court on June 16, 1995.
Tom Goodwin was employed for the relevant time period by Fleet Associates. Fleet Associates was hired by ALI to market loans in its portfolio, including the loans of Mr. Gebbie.
Mr. Goodwin reviewed documents and gathered data in preparing the loans for sale, including data from Mr. Carrier.
Mr. Goodwin did not negotiate and conclude the loans' restructuring. Mr. Goodwin never spoke to Mr. Gebbie or Attorney Block.
The documentation provided to prospective bidders included an Offering Summary and Loan Overview. The first document provided to the prospective bidder is the Loan Overview, and this was provided to Cadle Company at its request. The Loan Overview is entitled Environmentally Impaired Asset Offering, 12 Loans 2 Real Properties and includes the Gebbie Loans.
The Loan Overview described both the Stockhouse and Fitchville Mortgages.
The Loan Overview included a very specific notice that the loans had been restructured and conveyed the terms thereof. Potential bidders, including The Cadle Company, were put on notice that the $4,000 deposit had been paid.
After review of the Loan Overview, a prospective bidder could request the Review File of the loan or loans in which the prospective bidder is interested. In the case of the Gebbie loans, it is entitled "Loan Pool 5 Bid Date: April 26, 1995." The Cadle Company requested and received a copy of the CT Page 5893 Review File.
As a prospective bidder, the Cadle Company also received an unsigned copy of the Loan Sale Agreement.
The Loan Sale Agreement as part of the bidding process is required to be signed by the successful bidder, unaltered for his bid to be accepted.
The Loan Sale Agreement provided further notice of the loans' restructure in its paragraph 4.1, which states:
 On the Closing Date, the Buyer shall pay to the Seller, either in cash or by wire transfer in immediately available funds, the amount of the Purchase Price, less the Earnest Money, if any, previously paid by the Buyer and less the aggregate amount of Collections received by the Seller on or after the Calculation Date and prior to the Closing Date, except for the $40,000 restructure payment relating to the Gebbie, Darwin loan in Pool No. 6 which shall be retained by and inure to the benefit of the Seller regardless of whether the payment is received by the Seller before or after the Calculation Date or the Closing Date.
It is common practice to modify loans during the course of marketing the loans for sale and the practice in trade is that, if loans are restructured during the course of their sale, the purchaser is bound by the restructured agreement. The loan overview described an agreement reached during the course of a loan sale.
Dan Cadle, on behalf of The Cadle Company and Tom Goodwin, on behalf ALI, Inc., discussed the loan restructure before The Cadle Company bid on the loans.
The Cadle Company bid on the loans of Mr. Gebbie on the bid date of April 26, 1995.
The Cadle Company, acting by Dan Cadle, made one bid for the two loans of Mr. Gebbie. The bid was in the amount of $151,410.00. The Gebbie loans had a total balance of over $600,000.00.
On April 26, 1995, Cadle was the successful bidder for the two loans. CT Page 5894
The Cadle Company is an investment company that primarily buys loans, and has been in business for almost ten years.
Dan Cadle is and has been president, chairman of the board and sole stockholder of The Cadle Company.
Dan Cadle was the one who reviewed the documents from Fleet and then made the bid, although he probably did not spend more than 20 minutes on the process.
Dan Cadle did not ask for written documentation of the restructuring of the loans of Mr. Gebbie.
Dan Cadle for The Cadle Company admits that ALI and Mr. Gebbie had reached an agreement to restructure the loans, but he believed that since the 30-day time period to close had expired, he is not bound by the letter agreement, even if ALI waived the 30-day closing period.
Dan Cadle for The Cadle Company admits that it, as a successor to ALI, is bound by any agreement made between ALI and Mr. Gebbie during the time the loans were owned by ALI.
Dan Cadle for The Cadle Company admits that, for the whole time that ALI owned the loans, ALI could make and modify the deal as it chose, including to extend any dates for performance, but he did not inquire if the time periods contained in Exhibit P-2 had been extended.
The loan sale agreement, signed by Dan Cadle on April 28, 1995, provided, inter alia, that the buyer did not rely on any separate oral or written representations, that buyer was a sophisticated investor, and that the buyer has reviewed the entire agreement (including its paragraph 4.1).
Tom Goodwin communicated to The Cadle Company that it was the successful bidder and countersigned the loan sale agreement.
On May 5, 1995, a bill of sale was executed between ALI and Cadle; accordingly, Cadle became the successor owner of the two loans of Mr. Gebbie.
Mr. Gebbie was and continues to be ready, willing and CT Page 5895 able to proceed to the closing of the settlement; he has awaited the further documents from ALI then Cadle. Mr. Gebbie never breached any term of the restructuring agreement, but has been denied the benefit of the bargain as Cadle has refused to honor it.
The Cadle Company has not raised a claim of breach of warranty in what it was told of the loans of Mr. Gebbie. There was no cross claim filed in this case by The Cadle Company against ALI.
Discussion
The plaintiff, Mr. Darwin C. Gebbie made a deal with ALI, Inc. to restructure two defaulted mortgages originally written with the now failed New England Savings Bank. He made that restructuring deal with ALI, Inc. as represented by a letter between counsel dated March 14, 1995, and paid to ALI a nonrefundable $4,000 deposit. After the date of the letter, but before the closing on the restructuring, the loan was sold to the defendant, The Cadle Company, which has disavowed this agreement. The plaintiff cannot get ALI, which admits that it had an agreement with the plaintiff, to perform because it no longer owns the loans, and the plaintiff cannot get performance from Cadle, which claims it is not bound by ALI's agreement.
The plaintiff, therefore, brought this action in seven counts. The following are the operative counts under which the plaintiff seeks his relief.
First Count: Seeking a declaratory judgment as to both defendants declaring that the plaintiff has a binding agreement restructuring his debt.
Second Count: Seeking specific performance as to both defendants.
Fifth Count: Seeking damages for interference with the plaintiff's contract expectancies, as to both defendants.
Sixth Count: Seeking damages for breach of contract as to both defendants.
Seventh Count: Seeking damages under the Connecticut CT Page 5896 Unfair Trade Practices Act as to both defendants.
The plaintiff has abandoned the claims for injunctive relief and accounting, but claims all of the other relief requested in his complaint. The defendant Cadle filed a counterclaim which, by agreement of the parties, has been bifurcated from the trial, and will be tried by the court only after the court rules on the plaintiff's complaint, should the defendant prevail.
The issues presented in this case are:
(1) Did Gebbie and ALI have a binding agreement?
(2) Is The Cadle Company bound by the agreement reached between Gebbie and ALI?
(3) Is the plaintiff entitled to specific performance of this agreement?
(4) Is the plaintiff entitled to punitive damages?
Both the plaintiff and the defendant, ALI, Inc., have stipulated that they had an agreement to restructure the plaintiff's obligations with ALI. Both Mr. Carrier and Mr. Gebbie testified at length as to the terms of the agreement, their understanding of it, and that both agreed to its terms.
Basic contract law requires that in order for there to be a binding contract between two parties, there must be an offer and an acceptance. The acceptance of the offer must be unequivocal and may be shown by actions or conduct. Pleinesv. Franklin Const. Co., Inc., 30 Conn. App. 612, 616-617
(1993).
The letter of March 14, 1995, from Attorney Geraghty to Attorney Block (P-2) was ALI's offer to settle the Gebbie loans under the terms and conditions stated therein.
Attorney Block's letter of March 21, 1995, to Attorney Geraghty is Gebbie's acceptance of the ALI's offer. The letter states, in pertinent part, "This conforms to the requested deposit pursuant to your letter of March 14th." It is an unequivocal acceptance, sending the requested $4,000 deposit and being unconditional. CT Page 5897
The defendant Cadle has filed no special defenses to this action, but at trial has raised two defenses under which it claims that there was no binding contract between Gebbie and ALI. Cadle claims that the agreement violated the statute of frauds, Connecticut General Statutes § 52-550; and the agreement expired by its own terms because there was no closing within 30 days of the March 14th letter.
The statute of frauds requires that an agreement for the sale of real estate or any interest in or concerning it must be in writing and signed by the party to be charged, or his agent, to be enforceable.
 The memorandum of the contract need not be the contract itself, but must contain sufficient data whereby a contract satisfying the terms of the prior oral agreement of the parties might be put in extended and customary form, without the aid of oral proof. Handy v. Barclay, 98 Conn. 290, 295.
 A memorandum is insufficient where a decree based thereon would not carry out the true agreement as made by the parties or where the agreement stated in the memorandum does not express the entire agreement between the parties so these must be supplemented by parol evidence of the negotiations. Gendleman v. Mongillo, 96 Conn. 541, 545.
Santoro v. Mack, 108 Conn. 683, 688 (1929).
The agreement between ALI and Gebbie effectively took two notes and mortgage obligations, and in consideration of a payment of $40,000 (including the $4,000 deposit): (a) reduced a total balance of over $700,000 to $160,000 payable over a ten-year term with a 30-year amortization at a stated rate of interest; (b) cancelled the total obligations if the repayment terms were fully met; and (c) reinstated the full balance in the event of default.
In the case of Becker v. Dramin, 6 Conn. Sup. 33 (1938), the court held that an oral agreement to provide a mortgagee with life use of an apartment in the mortgaged premises, in consideration of the cancellation of the debt, was binding although not in writing. The theory in holding that an oral agreement to cancel (or modify) a note secured by a mortgage does not violate the statute of frauds goes to the mortgage CT Page 5898 being only security for the debt, the cancellation or modification only going to the note.
 The interest in land is transferred to the mortgagee only as security and, therefore, the mortgagee is treated as the owner of the land only for such purposes as are incidental to the enforcement of his security . . . . If the debt is cancelled the security lapses as a matter of course. The security follows the debt and if the debt is cancelled there is nothing left to be secured, and, in equity, the security goes back to him who gave it . . . . it is therefore apparent that the verbal contract set up in the cross complaint was not an agreement for the conveyance of an interest in lands. It was rather an agreement to cancel a debt and not within the statute of frauds.
Becker v. Dramin, supra, at 34-35, citing McKelvey v. Creevey,72 Conn. 464.
In the case at hand, we have more than an oral agreement. We have an exchange of letters, an offer and acceptance. We also have the testimony of the parties to the agreement that they understood the agreement, reaffirmed the terms, and agreed that the terms were binding on them. Lastly, we have a written stipulation of the parties to be charged, Gebbie and ALI, again affirming the agreement. "Evidence concerning the intention of the parties may be found in the conduct and language of the parties and the surrounding circumstances."Giogio v. Nukem, Inc., 31 Conn. App. 169 (1993),. "Proof that a contract has been modified is established by a showing of mutual consent." May Centers Inc. v. Paris Croissant ofEnfield Square, Inc., 42 Conn. Sup. 77 (1991).
There was mutual consent and clear intention to be bound by the terms of the modification.
There is little doubt that Dan Cadle knew of the existence of an agreement between Gebbie and ALI.
Mr. Cadle is trying to take advantage of a mistake that he made in his bid. He assumed that since the restructuring with Mr. Gebbie had not "consummated," that he was not bound by the agreement that existed between ALI and Mr. Gebbie.
Where a party realizes he has only limited information upon CT Page 5899 the subject of a contract, but treats that knowledge as sufficient in making the contract he is deemed to have assumed the risk of a mistake. 1 Restatement (Second), Contracts § 154.
Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401,408 (1983).
While Mr. Cadle did not have the benefit of seeing the March 14th letter, the terms of the letter were clearly set forth in both the loan overview and the loan sale agreement. Mr. Cadle testified that he did not, prior to the time he signed the loan sale agreement, ask for any "writing" concerning the $4,000 deposit, the $40,000 restructuring payment or any other terms of the restructuring. He assumed that he was not bound by the agreement since he interpreted documentation to be the formal loan modification documents which would be executed at a closing. ". . ., there was no evidence either then or now that any settlement agreement was ever consummated." The loan sale agreement gave the buyer remedies for claimed breaches of warranty and a right to request repurchases by ALI within 120 days of closing. There is no evidence that Cadle has ever demanded repurchase. In fact, he testified he has not made any such demand. Rather than pursue his remedies with ALI, Mr. Cadle has indicated his willingness to assume the responsibility for his mistake. He stated in his deposition, "But if they did have a written agreement, we would have had to honor it."
As a result of the assignment of Gebbie's obligations to Cadle, it is now a "holder" of the Gebbie note, mortgage and other loan documents. Cadle's status as an assignee has not been raised as an issue in this case by pleadings or at trial, but Cadle's purchase of the note is a transaction covered by Article 3 of the Uniform Commercial Code. Connecticut General Statutes § 42a-3-101, et seq. ("Code"). Under the Code, a holder of a note takes that note free of defenses as provided in § 42a-3-305, if the holder is a "holder in due course," all defenses that would be available to the obligor in a suit on the note are good defenses against the holder. Rosa v.Colonial Bank, 207 Conn. 483, 491 (1988).
Cadle Company is NOT a "holder in due course" as that term is defined in the Uniform Commercial Code, Article 3. A "holder in due course" is defined in Connecticut General CT Page 5900 Statutes § 42a-3-302. One is not a "holder in due course" if one has taken the instrument with notice that the instrument is overdue or that the instrument is in default. "If a due date with respect to principal has been accelerated, the instrument becomes overdue on the day after the accelerated due date." Connecticut General Statutes § 42a-3-304(b)(3). it is uncontroverted that the Gebbie loans were in default, that ALI had made demand for payment in full and, in fact, commenced foreclosures of both mortgages. The loan overview clearly stated the date of the last payment on each loan, and the fact of the foreclosures was disclosed in the loan summary. Cadle knew that he was buying obligations that were in default and were overdue. Cadle, having been in the business of purchasing loan obligations for many years, having done business with ALI in the past, and having received copies of the loan overview and loan summary, also knew that the obligations originated with the failed New England Savings Bank. Under all of these circumstances, he could not have been a holder in due course, without knowledge of default or that the debts were past due.
A holder of an instrument, who is not a holder in due course, takes that instrument subject to all of the defenses of a party which would be available in an action in a suit under the note. Rosa v. Colonial Bank, supra, at 491. In any suit on the note brought by ALI, Gebbie would have had both a defense that there was a modification agreement in place and that ALI had waived the 30-day closing period. Those defenses that would have been available against ALI, would have been available to Gebbie against Cadle.
Gebbie seeks from the court the benefit of the bargain that he made with ALI. Although ALI would carry out its agreement, it cannot do so because the obligations were sold to Cadle. Gebbie can only get that benefit from Cadle Company.
"As a general rule, equity, in deciding whether to grant specific performance in enforcing a contract, will consider the fairness of an agreement in accordance with the circumstances as they existed at the time of the execution of the contract. Sink v. Meadow Wood Country Estates, Inc.,18 Conn. App. 569, 578 (1989); Robert Lawrence Associates Inc.v. Del Vecchio, 178 Conn. 1, 11 (1979); Texaco Inc. v.Golart, 206 Conn. 454, 462-63 (1988); Nann v. Pignatelli,
CT Page 59013 Conn. App. 74, 78 (1984). Granting specific performance, as an equitable remedy, is within the sound discretion of the court. Nann v. Pignatelli, supra, at 79; Texaco, Inc. v.Golart, supra, at 463.
At closing argument it was stated that Mr. Gebbie is not primarily seeking money damages from Cadle. Mr. Gebbie owns two properties. He seeks to keep his two properties and pay back the obligation, as modified. He has the balance of the earnest money required by the agreement and is prepared to pay that to Cadle at closing. Since the terms of the modification were fully disclosed to Cadle when the loans were purchased, Cadle would be getting precisely what was disclosed when he bid. Mr. Gebbie would be getting that which he paid $4,000.00 to get. ALI, which sold the loans to Cadle, would be under no obligations to either Cadle or Gebbie. All specific performances will mean is that Cadle will make less money than he would like on his investment in the Gebbie loans. But since the modification was disclosed, that is to be expected. Cadle took the risk when he refused to honor the agreement that a court could force him to perform. He had nothing to lose by putting the parties through this litigation. If won, he had the possibility of realizing more than the amount which could be realized under the modification. If he lost, he knows what the obligations are worth based upon the terms of the modification. Under all of the circumstances of this case, specific performance serves the ends of justice.
Plaintiff, Mr. Gebbie, has pled a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. Sections 42-110a, et seq., in the seventh count of his complaint. CUTPA provides, inter alia, that "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Section 42-110b(a).
"Person" has been defined to include corporations and "trade or commerce" has been defined to include the sale or distribution of "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." Conn. Gen. Stat. Section 42-110a(3) and (4). Mortgage loan transactions have been considered subject to CUTPA coverage. See, e.g., Cheshire MortgageServices, Inc. v. Montes, 223 Conn. 80, 105 (1992). CT Page 5902
Cadle's refusal to honor and effectuate the loans restructure agreement and their related conduct, including failing to release the foreclosure attachments and lis pendens, constitute a violation of the Act.
The defendants have retained the plaintiff's deposit since March, 1995 and failed to consummate the debt restructure contemplated by the Letter Agreement. Cadle Company has been in the business of purchasing loan obligations for at least 10 years and can be imputed with knowledge of how the business of loan sales is conducted. Not content to let the judicial process take its course, Mr. Cadle wrote to Mr. Gebbie on February 26th of this year, advising that he consider suing his own lawyers, and pay the Cadle Company $350,000.00 cash in full satisfaction of the obligations.
A violation of CUTPA can be found from a defendant's or defendants' acts or lack of action toward just the plaintiff, without reference to how it or they dealt with others at other times and places. See, e.g., Tessman v. Tiger LeeConstruction Co., 228 Conn. 42 (1993), Cheshire MortgageServices, Inc. v. Montes, 223 Conn. 80 (1992), Prishwalko v.Bob Thomas Ford, Inc., 33 Conn. App. 575 (1994). In the brief filed by counsel for ALI, Inc., there is a straightforward acknowledgment of the agreement between Gebbie and ALI, Inc. to restructure the subject loans.
There is a clear acknowledgment that Cadle Company stepped into the shoes of ALI, Inc. with full knowledge of the agreement by Cadle.
The restructuring agreement contained all the necessary terms and conditions to implement the same.
The record and the law is clear that a binding and enforceable agreement to restructure debt was reached between Gebbie and ALI, Inc. Defendant Cadle Company purchased the Gebbie loans with notice of and subject to the restructuring agreement.
The Cadle Company places great reliance on its claim that the restructure between Gebbie and ALI, Inc. was not consummated within 30 days and that there was no so-called "claw back" provision. CT Page 5903
ALI, Inc. did not insist on these conditions and was perfectly content to proceed to complete its agreement with Gebbie.
It was not for the Cadle Company to rewrite the deal, if they were not content they could have declined to bid on the loans. The Cadle Company chose to bid and is bound.
As to the issues presented in this case, the court finds:
1. Gebbie and ALI, Inc. had a binding agreement to restructure the loans.
2. The Cadle Company is bound by the agreement reached between Gebbie and ALI, Inc.
3. The plaintiff Darwin C. Gebbie is entitled to specific performance of the agreement reached between Gebbie and ALI, Inc. and to which the defendant Cadle Company is bound.
The court directs and orders that The Cadle Company submit to the plaintiff a mortgage modification agreement consistent with the terms of the March 14, 1995 letter and that said mortgage modification agreement be provided within 30 days of the date of this judgment. The mortgage modification agreement shall be finalized and executed within 10 days after receipt of the same and thereafter promptly recorded upon the land records.
The court finds that the defendant Cadle Company has violated CUTPA and awards attorneys fees in the amount of $11,281.25 in accordance with the affidavit. (Plaintiff's Exhibit 14.) In awarding attorneys fees, the court has considered, in addition to the time sheets provided by counsel, the time and effort required in these proceedings, the complexity thereof, the issues involved, the necessity for the litigation mindful of the Cadle Company's acknowledgment of the agreement between Gebbie and ALI, Inc., the reasonableness of the rates charged by counsel and the amounts of the financial issues involved.
In the event that The Cadle Company fails, to provide the mortgage modification agreement within the time limited CT Page 5904 herein, the court will enter such further order as may be required in recordable form to effectuate said modification and any other relief deemed appropriate by the court.
All foreclosure attachments and lis pendens are to be released at the time of execution of the mortgage modification agreement.
In accordance with the stipulation by counsel on May 7, 1996 before the court, the counterclaim of the defendant the Cadle Company is not to be considered or ruled on in these proceedings.
Judgment may enter, therefore, in favor of the plaintiff in accordance with the foregoing and against the defendant The Cadle Company.
No portion of attorneys fees is charged against the defendant ALI, Inc.
Upon the orderly execution of the mortgage modification agreement, judgment may enter dismissing the plaintiff's complaint as to the defendant ALI, Inc.
Austin, J.